RECEIPT #
AMOUNT $ ⸴2⸴5⸴7
SUMMONS ISSUED. Y⸴⸴
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. ⸴⸴
DATE 5-11-05

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INFORMATION          )
MANAGEMENT, INC.,                  )
                                   )
            Interpleader-Plaintiff, )
                                   )
      v.                           )    CIVIL ACTION NO.
                                   )
L&L TEMPORARIES, INC. and          )
FLEXIBLE FUNDING, LLC,             )
                                   )
            Interpleader-Defendants. )    05 - 10979 DPW
                                   )
                                        MAGISTRATE JUDGE Collings

## COMPLAINT FOR INTERPLEADER, DECLARATORY
## JUDGMENT AND INJUNCTIVE AND COMPENSATORY RELIEF

Interpleader-plaintiff Iron Mountain Information Management, Inc. ("Iron Mountain"),

by its attorneys, Sullivan & Worcester LLP, as and for its complaint for interpleader and

declaratory, injunctive and compensatory relief against interpleader-defendants L&L

Temporaries, Inc. ("L&L"), and Flexible Funding, LLC ("Flexible Funding" and together with

L&L, the "Claimants" or "Defendants"), alleges as follows:

### Nature of the Action

1.    Iron Mountain, the world's leader for outsourced records and information

management services, entered into contracts with L&L in 2004 pursuant to which L&L was to

provide and did provide temporary employment services, *i.e.*, temporary labor, for Iron

Mountain in the Greater Boston area. L&L allegedly signed and executed an accounts financing

agreement with Flexible Funding whereby L&L factored its accounts receivable including,

allegedly, any amounts due to L&L from Iron Mountain. L&L and Flexible Funding are now

making competing, adversarial claims on certain monies due and owing, but that Iron Mountain

{B0401627; 3}

is holding (the "Escrowed Funds"), for temporary labor provided by L&L. Iron Mountain seeks to have L&L and Flexible Funding interplead to determine their disputed, adversarial interests in the Escrowed Funds. Iron Mountain also seeks a binding declaratory judgment and order from the Court declaring whether Iron Mountain is liable to L&L or Flexible Funding for any allegedly misdirected payments or allegedly unpaid invoices. Finally, Iron Mountain seeks compensatory relief for damages that it has incurred.

## Parties

2.    Interpleader-plaintiff Iron Mountain is a Delaware corporation with a principal place of business located at 1000 Campus Drive, Collegeville, Pennsylvania. Iron Mountain is a wholly-owned subsidiary of Iron Mountain Incorporated (NYSE: IRM).

3.    Interpleader-defendant L&L is, upon information and belief, a Massachusetts corporation with a principal place of business located at 101 Tremont Street, Boston, Massachusetts.

4.    Interpleader-defendant Flexible Funding is, upon information and belief, a California limited liability company with a principal place of business located at 1 Embarcadero Center, San Francisco, California.

## Jurisdiction and Venue

5.    This Court has original jurisdiction over the subject matter of this action pursuant to the provisions of 28 U.S.C. § 1335 in that this is an action for interpleader or in the nature of interpleader and there is diversity of citizenship between the Claimants and the amount in controversy is more than $500. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

-2-

{B0401627; 3}

6.     Venue is proper in this district pursuant to the provisions of 28 U.S.C. § 1397 in that one or both of the Claimants reside in and are subject to personal jurisdiction in Massachusetts. Venue is also proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the dispute occurred in this judicial district.

## Background

7.     By written agreements dated April 20, 2004 (the "Contracts"), Iron Mountain and L&L agreed, among other things, that L&L would provide temporary labor to Iron Mountain. True copies of the Contracts are annexed hereto collectively as Exhibit A.

8.     Pursuant to the Contracts, L&L agreed to maintain complete and accurate accounting records in a form in accordance with standard accounting practices and retain such records (and make them available to Iron Mountain for review) for one (1) year from the final date of payment. Iron Mountain and L&L also agreed that L&L would bill monthly for the services provided and L&L agreed to provide a signed time slip with its invoices.

9.     Pursuant to the Contracts, L&L and Iron Mountain agreed that Iron Mountain's payments would be directed to:

> L&L Temporaries, Inc.
> P.O. Box 1300
> Suisun City, CA  94585-4300
> syerdon@lnlassociates.com
> (617) 423-4955

10.     One of the Contracts provides that it may not be assigned without the written permission of the non-assigning party.

11.     The Contracts, by their terms, are governed by Massachusetts law.

-3-

{B0401627; 3}

12. Pursuant to the Contracts, any notices to Iron Mountain were required to be sent

to either:

> Iron Mountain Information Management, Inc.
> 745 Atlantic Avenue
> Boston, MA 02111
> Attn: Garry Watzke, Vice President & General Counsel
> Telefax: 617-368-9117

> or

> Iron Mountain Information Management, Inc.
> 96 High Street
> North Billerica, MA 01862
> ATTN: General Manager

13. On or about February 18, 2004, which was more than two (2) months before Iron

Mountain and L&L entered into the Contracts, Flexible Funding, through its Boston counsel,

allegedly sent a letter to one of Iron Mountain's facilities at 32 George Street, Boston,

Massachusetts, advising Iron Mountain that Flexible Funding had financed L&L and that all

loans to L&L are secured by a first priority lien in the accounts receivable of L&L. In its

February 18, 2004 letter, Flexible Funding also claimed it discovered in a review of its records

that certain payments allegedly due from Iron Mountain had been misdirected. Flexible

Funding's letter further directed Iron Mountain to make payments to P.O. Box 1300, Suisun

City, CA 94585-4300. At the time of the February 18, 2004, letter from Flexible Funding to Iron

Mountain, Iron Mountain did not have any business relationship with and did not owe any

money to L&L; accordingly, such letter was of no import or interest to Iron Mountain.

14. One year later, on or about February 18, 2005, Flexible Funding, again through its

Boston counsel, sent a letter to Iron Mountain's General Counsel. In its February 18, 2005 letter,

Flexible Funding stated that certain payments had not been received by Flexible Funding and

advised Iron Mountain that Flexible Funding is the assignee of L&L's present and future

-4-

{B0401627; 3}

accounts (though one year earlier it stated that Flexible Funding was merely a lien holder) and directed that any payments on L&L invoices should be sent to Flexible Funding in California.

15.     On March 9, 2005, Shelly Baldwin, Collector II at Euler Hermes ACI, located in Owings Mills, Maryland and which claims to be a credit insurer representing Flexible Funding, wrote to Iron Mountain regarding 27 invoices that Flexible Funding asserted were owed and unpaid by Iron Mountain.

16.     On March 15, 2005, in an effort to correct Euler Hermes' misunderstanding, Iron Mountain responded to Ms. Baldwin and explained that of the 27 invoices identified in Ms. Baldwin's letter, Iron Mountain's records reflect only 11 such invoices issued by L&L. Iron Mountain further explained that it had paid all 11 invoices in full (and provided a chart outlining when and in what manner each invoice had been paid).

17.     On March 17, 2005, Iron Mountain wrote to Flexible Funding's Boston counsel explaining that, based on Iron Mountain's own internal investigation, it did not believe that Flexible Funding's statement that certain payments due from Iron Mountain to L&L had been misdirected was accurate. In that March 17, 2005 letter, Iron Mountain requested that Flexible Funding provide the information and documentary support of its assertion of misdirected payments. Pursuant to Section 9-405(c) of the Massachusetts Uniform Commercial Code, Mass. Gen. Laws c. 106, § 9-405(c), Iron Mountain also requested proof of Flexible Funding's entitlement to payment of any L&L invoice to Iron Mountain. Flexible Funding did not provide any such proof to Iron Mountain, as required by the statute.

18.     On March 17 and 18, 2005, Ms. Baldwin of Euler Hermes ACI responded to Iron Mountain's letter of March 15, 2005 referred to in paragraph 16, *supra*. Ms. Baldwin asserted, incorrectly, that there were many L&L invoices that had either been unpaid or "short-paid" or

-5-

{B0401627; 3}

that payments had been misdirected. In connection with her letters of March 17 and 18, 2005, Ms. Baldwin enclosed copies of invoices that had allegedly been sent to Iron Mountain for services that L&L had allegedly provided to Flexible Funding. Ms. Baldwin also enclosed what she alleged were computer screen prints from Iron Mountain's accounts payable system showing amounts which Iron Mountain allegedly owed to L&L (and thus allegedly owed to Flexible Funding).

19.     On March 30, 2005, Iron Mountain sent a letter to Ms. Baldwin of Euler Hermes ACI responding comprehensively to all of the issues that Ms. Baldwin had raised to date. As for the "short-paid" invoices, Iron Mountain explained, among other things, that in each and every instance where Flexible Funding's records indicate that Iron Mountain "short paid" an invoice, the amount that L&L allegedly reported to Flexible Funding as being invoiced to Iron Mountain differed, in many cases very significantly, from the amount of the actual invoice which L&L sent to Iron Mountain. Iron Mountain further explained that where Flexible Funding's records allegedly indicate that Iron Mountain failed to pay L&L invoices, Iron Mountain did not receive any of those invoices from L&L and, in any event, L&L did not perform any of the services purportedly reflected on those unpaid invoices such that Iron Mountain would not have paid them if they had been received. Finally, with respect to the alleged computer screen prints that Ms. Baldwin included in her previous letter, Iron Mountain pointed out that they "appear to be hand-modified screen prints" (*i.e.*, forged) and explained the factual basis for this conclusion.

20.     Upon information and belief, L&L submitted inaccurate documentation, including documents purporting to be invoices from L&L to Iron Mountain that were not actually sent to Iron Mountain, to Flexible Funding with inflated invoices in an effort to borrow more money than it was entitled to borrow from the accounts financing agreement between the two Claimants.

21.     By electronic mail dated December 1, 2004, from L&L's President, Susan
Yerdon, L&L informed Iron Mountain that its accounts financing agreement with Flexible
Funding had been terminated and that all payments should be made to L&L's office on Tremont
Street in Boston. Upon being so advised, and still having not received any proof of Flexible
Funding's entitlement of direct payments from Iron Mountain on L&L invoices, Iron Mountain
escrowed any amounts owed (*i.e.*, the Escrowed Funds) and attempted to determine to whom it
should make any payments.

22.     As of January 12, 2005, L&L's invoices to Iron Mountain stated that payments
were to be remitted to L&L's Tremont Street office in Boston.

23.     L&L and Flexible Funding have both claimed a conflicting, adversarial interest in
the Escrowed Funds, which currently total $231,416.53. Iron Mountain has no basis for forming
an independent opinion as to which of the competing claims is meritorious.

24.     Flexible Funding recently filed a complaint against Iron Mountain in a California
state court in San Francisco (the "California Action"). However, Flexible Funding did not name
L&L as a party in the California Action. The presence of L&L as a party is necessary for a
complete adjudication of the rights and obligations of the parties in respect to the subject matters
of this action.

### Count I:  Interpleader
### (As to L&L and Flexible Funding)

25.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1
through and including 24 as if set forth in full herein.

26.     Due to L&L's and Flexible Funding's competing claims, Iron Mountain is
exposed to and unfairly risks the possibility of multiple or conflicting liability.

-7-

{B0401627; 3}

27.    The burden of unnecessary litigation and the risk of loss by Iron Mountain resulting from exposure to the possibility of multiple or conflicting liability will be best avoided by an interpleader action.

28.    Iron Mountain accordingly requests that the Court authorize this interpleader action to proceed and permit Iron Mountain either to continue to hold the Escrowed Funds until such time as L&L's and Flexible Funding's competing claims have been resolved or to deposit the same with the Clerk of this Court.

## Count II: Declaratory Judgment and Injunctive Relief
### (As to L&L and Flexible Funding)

29.    Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 28 as if set forth in full herein.

30.    Flexible Funding claims that Iron Mountain has misdirected payments to L&L when those payments should be delivered to Flexible Funding.

31.    Flexible Funding claims that Iron Mountain has failed to pay or has "short-paid" invoices due and owing from L&L.

32.    Contrary to these claims, Iron Mountain has not misdirected payments and has paid all invoices that have been properly presented to Iron Mountain.

33.    Iron Mountain and the Claimants have adverse legal interests and an actual controversy exists and is continuing between Iron Mountain on the one hand, and the Claimants on the other.

34.    The dispute between Iron Mountain and Claimants is an actual, real and substantial controversy that is justiciable by this Court pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201.

{B0401627; 3}

35. By reason of the foregoing, Iron Mountain is entitled to a conclusive decree declaring its rights and legal obligations as they relate to the Claimants' claims and to a preliminary and permanent injunction enjoining and restraining the Claimants and others from instituting or proceeding with any action or suit against Iron Mountain in any other jurisdiction, including but not limited to the California Action, with respect to or in any way relating to or arising out of the agreements, transactions and occurrences that are the subject matters of this complaint.

## Count III: Breach of Contract
### (As to L&L only)

36. Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 35 as if set forth herein.

37. Iron Mountain and L&L, for good and valuable consideration, entered into the Contracts. The Contracts reflect valid and binding legal obligations of Iron Mountain and L&L, enforceable in accordance with their terms.

38. Upon information and belief, L&L breached the Contracts by, according to Flexible Funding, assigning the Contracts to Flexible Funding.

39. Iron Mountain has fully performed its duties and obligations under the Contracts.

40. As a direct and proximate result of L&L's breach, Iron Mountain has suffered or is at a risk of suffering damages.

## Count IV: Misrepresentation
### (As to L&L only)

41. Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 40 as if set forth herein.

42. By electronic mail dated December 1, 2004, from L&L's President, Susan Yerdon,, L&L represented to Iron Mountain that the accounts financing agreement between L&L

-9-

{B0401627; 3}

and Flexible Funding had been terminated and that Iron Mountain should make all payments to L&L directly.

43.    Iron Mountain relied upon L&L's representations regarding the termination of the accounts financing agreement between L&L and Flexible Funding.

44.    Upon information and belief, L&L's representations regarding the termination of the accounts financing agreement between L&L and Flexible Funding were false.

45.    As a result of L&L's misrepresentations and Iron Mountain's reliance thereon, Iron Mountain has suffered or is at risk of suffering damages in an amount to be ascertained at trial.

### Count V: Mass. Gen. Laws ch. 93A
### (As to L&L only)

46.    Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 45 as if set forth herein.

47.    L&L's conduct, as set forth above, constitutes unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Mass. Gen. Laws c. 93A, § 2, actionable under § 11.

48.    Upon information and belief, among other unfair and deceptive acts and practices, L&L provided false and fraudulent invoices to Flexible Funding and forged Iron Mountain print screens in an effort to show to its factoring agent that Iron Mountain owed more to L&L than was actually due.

49.    L&L's unfair and deceptive acts occurred primarily and substantially in Massachusetts.

{B0401627; 3}

50. As a direct and proximate result of such unfair and deceptive acts and practices, Iron Mountain is exposed to a loss of its money or property in an amount to be determined at trial.

51. L&L's conduct has been a knowing and willful violation of Mass. Gen. Laws c. 93A, §§ 2 and 11, and, as a result, Iron Mountain is entitled to treble damages and reasonable attorneys fees.

WHEREFORE, Iron Mountain respectfully requests that this Court:

A. Permit Iron Mountain either (a) to continue to hold the Escrowed Funds until such time as L&L's and Flexible Funding's competing claims to the Escrowed Funds have been resolved, or (b) to deposit the Escrowed Funds into this Court by delivering the same to the Clerk of the Court;

B. Discharge Iron Mountain from any other or further obligations with respect to the Escrowed Funds and require L&L and Flexible Funding to litigate in this Court their competing claims with respect to the Escrowed Funds;

C. Declare that Iron Mountain has not misdirected any payments that may have been owed to L&L or Flexible Funding and has paid all monies owed on all invoices that have been properly presented to Iron Mountain;

D. Enjoin and restrain L&L and Flexible Funding, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of such order by personal service or otherwise, from instituting or proceeding with any action or suit against Iron Mountain in any other jurisdiction with respect to or in any way relating to or arising out of the Escrowed Funds or the Contracts;

-11-

E.      Award Iron Mountain compensatory damages in an amount to be determined at trial;

F.      Award Iron Mountain at least double and up to three times actual damages, interest, costs, and attorneys' fees pursuant to Mass. Gen. Laws c. 93A;

G.      Award Iron Mountain its costs and expenses of action, including reasonable attorneys' fees and disbursements; and

H.      Award Iron Mountain such further relief as the Court deems just.


                                    **IRON MOUNTAIN INFORMATION
                                    MANAGEMENT, INC.**

                                    By its attorneys,


May 11, 2005                        _Samual A. Miller_
                                    Larry L. Varn (BBO #508130)
                                    *lvarn@sandw.com*
                                    Samual A. Miller (BBO #648568)
                                    *smiller@sandw.com*
                                    SULLIVAN & WORCESTER LLP
                                    One Post Office Square
                                    Boston, Massachusetts 02109
                                    (617) 338-2800



**IRON MOUNTAIN**
The Leader in Records & Information Management

## TEMPORARY SERVICES AGREEMENT

This Agreement dated this 20th day of April, 2004, by and between Iron Mountain Information Management, Inc., its affiliates and subsidiaries (hereinafter referred to as " IRON MOUNTAIN" ), and L & L Temporaries, Inc (corporation, individual proprietorship, partnership) (hereinafter referred to as " AGENCY" ), with offices at 101 Tremont Street, Boston, MA (Federal Tax ID or social security #) 02-0581393.

1. **Retention of AGENCY**
   IRON MOUNTAIN hereby engages AGENCY to provide temporary personnel to IRON MOUNTAIN pursuant to the terms and conditions set forth herein.

2. **General Terms and Conditions**
   AGENCY shall provide to IRON MOUNTAIN the services of its employees as requested by IRON MOUNTAIN. AGENCY shall manage the provision of services to IRON MOUNTAIN in accordance with the provisions of this Agreement.

3. **AGENCY Responsibilities**
   AGENCY will coordinate with IRON MOUNTAIN for interview and assignment arrangements including date, time, location, agenda, duration, job content.

   AGENCY will have all potential temporary personnel for IRON MOUNTAIN complete the pre-screening and authorization form. AGENCY will need to review form, sign off and submit to hiring contact prior to assignment of temporary personnel.

   AGENCY shall be required to conduct a seven (7) year retrospective criminal background investigation on any employee it assigns to any IRON MOUNTAIN facility. AGENCY employees may begin an assignment once all IRON MOUNTAIN' S Temporary Services Agreement has been signed and the prescreening forms completed. However, the background investigation process must have been initiated by the AGENCY prior to assignment. AGENCY employees whose background checks have not been received within seven (7) calendar days must be removed from assignment until such time as the background check has been received and reviewed as described below.

   Any AGENCY employee whose background check discloses any criminal record will be removed from assignment until IRON MOUNTAIN' S Security Department and/or Human Resources Department review the results and the matter is adjudicated.

   To accommodate multiple assignments of the same personnel, the results of background investigations conducted under this section will be valid for one (1) year from the initial date of assignment.

   Contract and/or temporary employees assigned to Iron Mountain shall be required to undergo a substance abuse examination before he/she is assigned to any Iron Mountain

03/10/2005    13:39    NO.189    P03

facility. A minimum 5-panel substance abuse urinalysis examination is to be administered through a SAMSHA certified laboratory and MRO.

Temporary agencies will certify to Iron Mountain, in writing, that an examination was administered and negative results were received.


AGENCY will have gained the candidate's employment references and will provide them to IRON MOUNTAIN upon request. IRON MOUNTAIN reserves the right to verify all references provided by AGENCY.

Upon selection of AGENCY's candidate for the assignment, Company and AGENCY will sign the Conditions of Assignment verifying the candidate's name, type of assignment, hourly rate, start date and projected end date. IRON MOUNTAIN may terminate use of said candidate at any time without notice.

4.  **Payment and Invoicing**
AGENCY shall maintain complete and accurate accounting records in a form in accordance with standard accounting practices, and shall retain such records (and make available to IRON MOUNTAIN for review) for one (1) year from the final date of payment

AGENCY may invoice monthly for services provided. Invoices must be accompanied by a signed time slip, and are payable thirty days after receipt.

All invoices shall reference the contractor's name, the supervising manager's name and period being invoiced. Invoices should be directed to:

L & L Temporaries, Inc
P.O. Box 1300
Suisun City, CA 94585-4300
sverdon@lnlassociates.com
617-423-4955


5.  **Performance Guarantee -   AGENCY Personnel**
AGENCY agrees that should each employee placed with IRON MOUNTAIN on a contractual basis may be without financial obligation within sixteen (16) hours of commencing assignment should said AGENCY employee be found to be unqualified for said assignment.

In the event that IRON MOUNTAIN, at any time, determines that the work performed or any portion thereof is unsatisfactory, it may, immediately require the AGENCY to correct or improve its performance by notifying AGENCY in writing specifying the nature of the deficient performance. AGENCY shall take immediate steps to rectify the situation. Should the AGENCY fail to perform to the satisfaction of IRON MOUNTAIN within 10 days, IRON MOUNTAIN has the right to terminate this agreement. Upon such termination, IRON MOUNTAIN is liable only for the work performed, less any costs associated with rectifying the AGENCY's performance.

6. AGENCY Personnel – Employment

AGENCY agrees that any individuals performing Services hereunder shall at all times be employees or independent contractors of AGENCY and that such individuals shall not be deemed to be employees of IRON MOUNTAIN. AGENCY shall be exclusively responsible for the payment of any and all employment and other tax obligations (including employee benefits) arising out of payments to individuals assigned to provide Services hereunder.

AGENCY represents that its staff is comprised of experienced professionals qualified to perform the Services in accordance with the highest professional standards.

7. Temporary to Permanent Conversion

If AGENCY's employee is hired directly or indirectly by IRON MOUNTAIN or any of its divisions and/or affiliates, there will be no temporary-to-permanent conversion fee if the employee has worked at IRON MOUNTAIN for a period of at least twenty (20) consecutive weeks. If AGENCY's employee is hired directly or indirectly by IRON MOUNTAIN or any of its divisions and/or affiliates prior to completion of a twenty (20) consecutive week period, a temporary-to-permanent conversion fee will be paid as follows: Starting at 20% of the annual hiring base salary, the percentage will be reduced by 2% for every two weeks worked under the contract assignment.

Said conversion of AGENCY's employee to full-time employment with IRON MOUNTAIN is contingent upon the successful completion of the standard hiring process by AGENCY's employee. This includes but is not limited to application process, reference verification, drug screening and background investigation. Should AGENCY's employee fail the drug screening process, said employee's contractual employment with IRON MOUNTAIN shall be terminated immediately.

8. Term of Agreement

This Agreement shall commence when signed by both parties and continue until AGENCY has completed performance of the Services.   Notwithstanding the foregoing, IRON MOUNTAIN shall have the right to terminate this Agreement for convenience at any time upon notice to AGENCY. In the event of termination for convenience, IRON MOUNTAIN will pay AGENCY for all Services performed to the effective date of termination.

9. Warranty and Indemnification

AGENCY represents and warrants that it has the full right to enter into and perform its obligation under this Agreement.

AGENCY warrants that employees are qualified, and if required, licensed and tarriffed, as for couriers, if necessary under applicable laws to perform services required in the proposed states of operation.

10. No Infringement

AGENCY represents and warrants to IRON MOUNTAIN that any software, technology, tools, know-how or other intellectual property provided or used by AGENCY or its personnel for purposes of performing services pursuant to this Agreement will not violate any patents, trade secrets or copyright rights or other confidentiality rights of third

3

parties. AGENCY shall indemnify IRON MOUNTAIN and defend IRON MOUNTAIN from
any loss. claim. damage or cost arising from a breach of the foregoing warranty.

11. Insurance; Indemnification
AGENCY shall be solely responsible for all physical injuries (including death) to persons
(including but not limited to employees of IRON MOUNTAIN) or damage to property but
not limited to property of IRON MOUNTAIN or AGENCY or its contractors) resulting from
the negligent acts of AGENCY or its contractors, and shall indemnify and hold IRON
MOUNTAIN harmless from loss and liability upon any and all claims on account of such
injuries or damage; provided, however, that AGENCY and IRON MOUNTAIN, as the case
may be, shall be responsible for workers' compensation claims brought by their
respective employees, without regard to negligence of either. AGENCY' s contractors
shall each carry their own workers' compensation insurance. AGENCY' s and each of
its contractor' s compensation carriers shall waive any right of subrogation in favor of
IRON MOUNTAIN.

AGENCY shall procure and maintain the types of insurance listed below and in the
minimum limits shown. Such insurance shall be provided by an insurer authorized to do
business in the jurisdiction where services will be performed and that maintains an
A.M. Best' s rating of B-plus X or better. AGENCY will provide a certificate of such
insurance, which will identify IRON MOUNTAIN as an additional insured on the liability
policies.

| Coverage | Limits |
|---|---|
| Workers Compensation | Statutory |
| Employers' Liability | $2.0 million per accident or bodily injury by accident. $2.0 million aggregate for disease. and $2.0 million per employee for bodily injury by disease. |
| General Liability. including contractual | $2.0 million per occurrence combined single limit, $2.0 million aggregate |
| Automobile Liability | $2.0 million per accident, combined single limit |

12. OSHA Requirements
Acknowledging that injuries sustained by AGENCY employees at Iron Mountain sites may
require their recording on the site' s OSHA log, in the event of a totally or partially
disabling injury or AGENCY employee' s removal from the Iron Mountain site for
continued work. AGENCY agrees to provide Iron Mountain site with sufficient information
to fulfill it' s OSHA recordkeeping responsibilities. The information required includes
but is not necessarily limited to information necessary to complete the 301 associated
with the injury and ongoing data to update any ongoing restricted duty or lost time from
work. AGENCY agrees to continue to provide this information until maximum reporting
criteria are met.

4

### 13. Solicitation and Employment

During the term hereof, and continuing for a period of six (6) months following the cancellation or termination of this Agreement, IRON MOUNTAIN will not solicit for employment, attempt to hire or hire the employees or independent contractors of AGENCY; provided, that this provision shall not prohibit IRON MOUNTAIN hiring such persons if they respond to " help wanted" advertisements in newspapers or similar non-directed media, or the position has been initiated as a temporary to permanent conversion.

Said expectation is true in the reverse; AGENCY will not solicit IRON MOUNTAIN employees during the term of this agreement and continuing for a period of six (6) months following cancellation or termination, provided, that this provision shall not prohibit AGENCY hiring such persons if they respond to " help wanted" advertisements in newspapers or similar non-directed media or the position has been initiated as a temporary to permanent conversion.

### 14. Confidential Information

All original materials, information and technology developed for IRON MOUNTAIN pursuant to this Agreement will belong exclusively to IRON MOUNTAIN and will be deemed to have been developed and created by AGENCY for IRON MOUNTAIN as work for hire. IRON MOUNTAIN shall have all rights to use, exploit and license any products of work performed by AGENCY pursuant to this Agreement, including rights to patent or register any intellectual property produced by AGENCY hereunder.

Addendum 1 dictating the terms and conditions applicable to the protection of personal data is hereby incorporated into this agreement.

### 15. Assignment

This Agreement may not be assigned by either party without the prior written permission of the other.

### 16. Applicable Law

This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without giving effect to principles of conflicts of laws.

### 17. Notices

All notices, demands and other communications required or permitted hereunder or in connection herewith shall be in writing and shall be deemed to have been duly given if delivered (including by receipt verified facsimile transmission) or mailed in the Continental United States by first class mail, postage prepaid, to a party at the following address, or to such other address as such party may hereafter specify by notice:

#### If to AGENCY:

101 Tremont Street
Suite 515
Boston, MA 02108
Attn: Susan Yerdon
Telefax: (617) 423-4955

If to Client:

IRON MOUNTAIN INFORMATION MANAGEMENT, Inc.
745 Atlantic Avenue
Boston, MA  02111
Attn:  Garry Watzke, Vice President & General Counsel
Telefax:  617-368-9117

## 18. Section Headings

The headings and titles of sections, paragraphs and the like are inserted for convenience of reference only and shall no affect the meaning or interpratation of this Agreement in any manner.

## 19. Entire Agreement

This Agreement and the documents incorporated by reference in this Agreement sets forth the entire understanding between the parties hereto regarding the subject matter hereof and may not be amended except by an instrument in writing signed by both parties.

## 20. No Waiver

Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence.  No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

## 21. Counterparts

This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

IRON MOUNTAIN:                              AGENCY:

IRON MOUNTAIN
INFORMATION MANAGEMENT, INC.               L & L Temporaries, Inc

By: _____                         By: _____
Name: Steven Frisca                         Name: Susan Yerdon
Title: General Manager                      Title: President

6

## ADDENDUM 1

Additional Terms and Conditions Applicable to the Protection of Personal Data ("Addendum")

The following additional terms and conditions (*Addendum*) are expressly incorporated into the Base Agreement (as hereinafter defined) or into the terms and conditions of any procurement agreement entered into between Iron Mountain and the Provider whose name appears at the signature line.

1.     **DEFINITIONS.** The following terms shall have the respective meanings assigned below when used as capitalized terms in this Addendum.

*Base Agreement* means any agreement between Provider and Iron Mountain pursuant to which Provider renders Provider Services to Iron Mountain, including invoices, purchase orders or other like documents.

*Customer* means Iron Mountain's customers and the affiliates of any such customers.

*Data Subject* means a natural person who can be identified by or is the subject of Personal Data, including without limitation, employees, clients, contractors, or other associates of Iron Mountain or of a Customer of Iron Mountain, or the dependents of such person.

*Parties* means collectively, Provider and Iron Mountain, together with their respective successors and permitted assigns, and *Party* means each of them, as the context may require.

*Personal Data* means information that is identifiable to specific individuals, or by which specific individuals can be identified, whether or not publicly available, such as name, identification number, address, one or more factors related to physical, physiological, mental, economic, racial, cultural or social identity, habits, union membership or any other personal characteristics or attributes, obtained or accessed by Provider through its relationship with Iron Mountain.

*Process(ing)* means any operation or set of operations performed upon Personal Data, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

*Provider Services* shall be those services being rendered by Provider under the Base Agreement.

2.     **PROVIDER RESPONSIBILITIES.** Provider shall:

(a) not use any Personal Data to solicit Data Subjects or otherwise Process the Personal Data for any purpose other than the provision of the Provider Services;

(b) not disclose or transfer any Personal Data to any third party except (i) with the express prior written consent from Iron Mountain, and in the case of any such permitted transfer, Provider shall ensure that the third party enters into a written agreement acceptable to Iron Mountain obligating that third party to comply with the standards and requirements set forth in this Addendum or (ii) pursuant to law;

(c) not record, copy or retain any Personal Data except to the extent and for the duration required to provide the Provider Services and as otherwise required by applicable law;

(d) upon reasonable request and without material disruption of Provider's business, permit Iron Mountain or its authorized representatives, upon providing not less than twenty-four hours' advance notice, to examine any Personal Data in Provider's possession or custody. If a Data Subject wishes to examine any Personal Data in Provider's possession, Provider shall retrieve the

7

Personal Data and promptly return it to Iron Mountain so that Iron Mountain may, in turn, meet its obligations with respect to the examination of any such Personal Data;

(e) upon request by Iron Mountain, return specified Personal Data to Iron Mountain, or at the direction of Iron Mountain, correct, delete, update or otherwise modify the Personal Data;

(f) maintain and Process the Personal Data in accordance with applicable laws and any industry or other codes of practice, provided that all such applicable laws and industry standards meet or exceed the standards and safeguards required under this Addendum;

(g) ensure the compliance by its employees and representatives involved in maintenance or Processing of Personal Data provided under the terms of this Addendum;

(h) keep Personal Data confidential and maintain adequate technical and organizational measures consistent with professional industry standards for the protection of Personal Data, to:

> 1. respect and maintain the confidentiality and security of Personal Data and prevent unauthorized persons from gaining access to Personal Data;
>
> 2. prevent storage cartons, files or other media containing Personal Data from being read, copied, modified or removed by unauthorized persons;
>
> 3. ensure that Personal Data cannot be read, copied, changed or deleted by unauthorized parties during data transfer or data carrier transport (transport control);
>
> 4. prevent accidental or unlawful destruction or accidental loss, alteration, disclosure or access to Personal Data; and
>
> 5. continue to review its security programs and procedures to ensure that they are consistent with professional industry standards, provided that all such security programs and industry standards meet or exceed the standards set forth in this Addendum.

(i) ensure that all Personal Data shall remain in the jurisdiction(s) set forth in <u>Attachment 1</u> to this Addendum.

(j) to mitigate, to the extent practicable, any harmful effect that is known to Provider of a use or disclosure of Personal Data by Provider in violation of the requirements of this Addendum;

(k) to immediately report to Iron Mountain any use or disclosure of Personal Data not provided for in this Addendum and to document any such disclosures as the same may be required for purposes of providing any Data Subject with an accounting of disclosure of Personal Data; and

(l) not to Process any Personal Data in the possession of Provider unless expressly directed in writing by Iron Mountain to do so.

3.    **GENERAL REQUIREMENTS.** Provider understands and agrees that this Addendum does not convey to Provider any ownership or other interest in and to the Personal Data. Without limiting any other similar requirements that may be applicable, Provider shall comply with all reasonable policies and requirements (including, without limitation, execution of agreements) reasonably requested by Iron Mountain from time to time to protect Personal Data, including policies and requirements imposed in response to Iron Mountain's Customer requirements and/or applicable laws and regulations, as the same may be amended from time to time. However, if Provider is not able to comply with any such requirements without material expense or material risk, and Iron Mountain

8

nevertheless insists upon compliance, then Iron Mountain may terminate the Base Agreement (if any) pursuant to which Provider receives the Personal Data along with this Addendum.

4.   **PROVIDER'S INTERNAL REQUIREMENTS.** Provider's policies and procedures regarding data privacy and security as of the date hereof are attached as Attachment 2 to this Agreement. In addition to, and without limitation of, the foregoing provisions of this Addendum, Provider will adhere to the policies and procedures set forth in Attachment 2 in connection with Provider's handling of Personal Data pursuant to the terms of this Addendum or the Base Agreement (if any). To the extent the Base Agreement contains provisions relating to the security, disclosure or other Processing activities (other than the specific details describing the Provider Services) that conflict with the terms of this Addendum, the terms of this Addendum shall supersede to the extent of such conflict. If Provider enhances its general policies and procedures regarding data privacy and security at any time during the term of this Addendum in a manner that could improve protection for Iron Mountain, its Customers and Data Subjects, such enhanced policies and procedures will become a part of Attachment 2 (subject to Iron Mountain's prior written consent), such that at all times Provider's obligations under this Addendum are consistent with the highest standards and levels of protection offered by Provider to any party.

5.   **AUDIT OF RECORDS.** Provider agrees to make its internal practices, books and records relating to the use and disclosure of Personal Data received from, or created or received by Provider on behalf of Iron Mountain or one of its Customers, available to Iron Mountain, or at the request of Iron Mountain, by any governmental agency having jurisdiction with respect to the Personal Data.

6.   **INDEMNIFICATION.** In addition to and not in lieu of any indemnification obligations set forth in the Base Agreement, Provider agrees to indemnify, defend and hold harmless Iron Mountain, its subsidiaries, affiliates, shareholders, directors, officers, employees and agents, from any claim, demand, liability, expense, or loss, including reasonable attorneys' fees, made by any third party due to or arising out of, or in any way connected with Provider's Processing of or access to the Personal Data, Provider's violation of this Addendum, or Provider's failure to adhere to any law applicable to the Processing and security of the Personal Data.

7.   **GENERAL.**

(a)  Term. This Addendum shall continue for the duration of any Base Agreement, provided, however, that Iron Mountain may terminate this Addendum without cause at any time upon sixty (60) days' prior written notice to Provider.

(b)  Termination for Cause. Upon a material breach by Provider, Iron Mountain shall provide an opportunity for Provider to cure the breach and terminate the Addendum (together with the Base Agreement) if Provider does not cure the breach within the time specified by Iron Mountain, or immediately terminate this Addendum (and the related Base Agreement) if Provider has breached a material term of this Addendum and cure is not possible.

(c)  Effect of Termination. Upon termination of this Addendum for any reason, Provider shall return, or, at the written request of Iron Mountain, destroy or de-identify all Personal Data received by Provider from Iron Mountain, or created or received by Provider on behalf of Iron Mountain or its Customers, and Provider shall cause its own third party service providers to do the same in respect of the Personal Data. Provider shall retain no copies of Personal Data. In the event that Provider is directed by Iron Mountain to destroy or de-identify Personal Data in lieu of returning it to Iron Mountain, then Provider shall provide a Certificate of Destruction to Iron Mountain, in form and substance reasonably acceptable to Iron Mountain. The provisions of Sections 1, 5, 6 and 7 shall survive the termination or expiration of this Addendum.

(d)  Assignment. In addition to any requirements or limitations affecting assignment under a Base Agreement, Provider will not assign any Base Agreement unless the assignee agrees to this Addendum with respect to Personal Data transferred to the assignee pursuant to the assigned Base

9

Agreement. The foregoing notwithstanding, this Addendum shall bind and inure to the benefit of the Parties to this Addendum and their respective successors, executors, heirs, representatives, administrators and permitted assigns.

(e) Notices. Any notice required or permitted under this Agreement shall be in writing and shall be effective on delivery or five (5) days after mailing if given by certified or registered mail, return receipt requested, postage prepaid, and addressed to the respective Party at the addresses set forth beneath its signature at the end of this Addendum, or such other address as the Party may designate to the other Party by notice complying with this provision.

(f) Governing Law. This Addendum shall be governed by and construed in accordance with the laws set forth in the Base Agreement, and in the event there is no governing law provision contained in the Base Agreement, then the Laws of the Commonwealth of Massachusetts shall govern without regard to its rules concerning conflicts of laws. Subject to the foregoing, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any Massachusetts state or federal court sitting in the City of Boston, Massachusetts. In the event of any conflict between foreign laws, rules and regulations and those of the United States, the laws, rules and regulations of the United States shall govern.

(g) Disputes. Subject to the dispute resolution process contained in the Base Agreement (if any), in the event of any dispute concerning this Addendum, the Parties shall each designate an executive, who shall meet and confer, in confidence, to attempt in good faith to resolve all outstanding differences between the Parties. These discussions shall be treated as confidential settlement discussions. If negotiated resolution has not been reached within fourteen (14) days of commencement of such conversations, then either Party may submit the dispute to binding arbitration in Boston, Massachusetts, under the Commercial Arbitration Procedures of the American Arbitration Association, before a sole arbitrator appointed by mutual agreement of the parties, or if agreement cannot be reached, then by the American Arbitration Association. The arbitrator's decision shall be final, and may be confirmed by the judgment of a court of competent jurisdiction. The arbitrator shall have no power or authority to award exemplary or punitive damages, or non-monetary or equitable relief of any sort. During the pendency of any arbitral or court proceeding, each Party shall bear its own attorneys' fees and costs, and the Parties shall each pay half the arbitration costs. The prevailing party in any arbitration or court proceeding under this Addendum will be entitled to recover its fees and costs incurred in the arbitration or proceeding (including attorneys' and arbitration fees and costs) from the non-prevailing Party.

(h) Equitable Relief. Provider acknowledges that monetary damages may be an inadequate remedy for breach by Provider of this Addendum and, accordingly, Iron Mountain may enforce this Addendum, without following the alternative dispute resolution procedures set forth herein, by seeking appropriate equitable relief.

| | |
|---|---|
| **Iron Mountain Information Management, Inc.**<br>*Iron Mountain* | **L & L Temporaries, Inc**<br>*Provider/Name of Agency* |
| By: | By: |
| Name: _STeve_ _fisCia_ | Name: Susan Yergon |
| Title: _Gevrel Manager_ | Title: President |
| Address for Notices:<br>_26 High Street_<br>_N. Billerica MA 01862_ | Address for Notices:<br>101 Tremont Street<br>Suite 515<br>Boston, MA 02108 |

10

**Attachment 1**

## LOCATION OF PERSONAL DATA WHILE IN PROVIDER'S POSSESSION:

Location/Address of Physical Personal Data:

Note: No employees of Provider are permitted to remove Personal Data from Iron Mountain's facilities.

Location of Personal Data in Electronic Format (generally the location of the server on which such electronic format of Personal Data resides):

Note: No employees of Provider are permitted to remove Personal Data in electronic form from Iron Mountain's facilities through any means whatsoever.

**Attachment 2**

## PROVIDER POLICIES AND PROCEDURES
## REGARDING DATA PRIVACY AND SECURITY

Please attach here a copy of the confidentiality agreement that your temporary employees are required to sign pursuant to which they agree to maintain the confidentiality of any information received by them from your clients during the course of performance of services.

Please also indicate here the manner in which you conduct reference checks for your temporary personnel and whether such persons undergo a background investigation or drug screening test.

In addition, please attach a copy of your policy regarding the treatment of confidential information and personal data that you provide to all temporary personnel.

## AGREEMENT

IT IS HEREBY AGREED by and between L&L Temporaries, Inc., and its successors and assigns, and Iron Mountain Information Management, Inc. (Boston District Only), ("CLIENT"),

WHEREAS, L&L Temporaries, Inc. is engaging in the business of assigning its employees to perform services for clients, and providing related management and human resources services; and

WHEREAS, CLIENT desires to engage L&L Temporaries, Inc. to provide such services;

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.   **DUTIES OF L&L TEMPORARIES, INC.**

A.    L&L Temporaries, Inc. shall provide to CLIENT the services of its employees ("Assigned Employees") as requested by CLIENT and shall manage them in accordance with the provisions of this Agreement.

B.    L&L Temporaries, Inc. agrees to assume full responsibility for paying, withholding, and transmitting payroll taxes; making unemployment contributions' and handling unemployment and workers' compensation claims involving Assigned Employees with respect to compensation that L&L Temporaries, Inc. has agreed to pay.

C.    L&L Temporaries, Inc. shall recruit, interview, test, screen, and ensure compliance with legally required pre-employment obligations, such as criminal conviction record, social security number verification, education, and drug testing, for all Assigned Employees prior to their assignment at CLIENT.

D.    L&L Temporaries, Inc. shall pay all costs associated with advertising for temporary employment positions covered by this Agreement.

E.    L&L Temporaries, Inc. will provide CLIENT with custom reporting on a monthly basis, as requested. Reports will include but are not limited to break outs of spend by facility (weekly, monthly, and YTD) and temporary employees on staff by hire date.

F.    L&L Temporaries, Inc. agrees to indemnification terms and other applicable terms as stated in the CLIENT's Purchase Order Agreement and its addendums.

1

G.    If a temporary employee does not fill the requirements of a project because of lack of appropriate skills to complete the project or chooses not to return before the project end date, L&L Temporaries, Inc. agrees to compensate the client with 8 16 hours

*eight* of training time (four for each employee) for the replacement employee, at no charge.

## 2.    DUTIES OF CLIENT

A.    CLIENT will pay for services provided by L&L Temporaries in accordance with this Agreement on a weekly basis. Payment shall be due thirty (30) days from receipt of the invoice.

B.    CLIENT agrees to pay for Assigned Employees at L&L Temporaries, Inc.'s unified rates (see attached) by job category in effect as of the date of the placement of the Assigned Employee with CLIENT. In the event a portion of any invoice is disputed, the undisputed portion shall be paid.

C.    CLIENT may hire or engage as independent contractor any Assigned Employee at any time after such Assigned Employee has worked at CLIENT's facility for at least 480 hours in any one calendar year (with no break in service of more than ten (10) business days) without owing L&L Temporaries, Inc. a placement fee. In the event that CLIENT hires or engages as an independent contractor any Assigned Employee prior to such 480 hour period, CLIENT shall pay to L&L Temporaries, Inc. an amount equal to what CLIENT would have paid L&L Temporaries, Inc. had such Assigned Employee worked at CLIENT through L&L Temporaries, Inc. for 480 hours at L&L Temporaries, Inc.'s then current rates.

D.    CLIENT agrees not to place any employee from any employment agency (other than L&L Temporaries, Inc.) at its facility(s) located at 175 Bearfoot Road, Northboro, MA, 32 George Street, Boston, MA, 21 Fellows Street, Boston, MA, 134 Hampden Street, Boston, MA, 28 Fitchburg Street, Somerville, MA, 1 Old Forge Hill Road, Franklin, MA, 1515 Washington Street, Braintree, MA, 17 Hydro Plant Road, Milton, NH, 26A Pleasant Street, Scarborough, ME, 148 Cook Street, Billerica, MA, 96 High Street, Billerica, MA, 216 Canal Street, Lawrence, MA during the term of this Agreement, unless L & L Temporaries, Inc. is not able to supply suitable Assigned Employee as requested. CLIENT will provide as much notice as reasonably possible for temporary labor needs. In most cases, L&L Temporaries, Inc. will have 24 hours to fulfill the request for temporary labor. However, if business needs of the CLIENT do not allow 24 hours, the CLIENT reserves the right to use other employment agencies to staff the project if L&L cannot provide adequate staffing within the timeframe. Quality requirements must also be met by L&L Associates, Inc. Record Center temporary

2

employees must maintain the productivity standard dictated by the project scope and data entry temporary employees must meet the minimum 8000 key strokes per hour with 98% accuracy standard. Other productivity and quality requirements will be communicated with requests for temporary employees. Current temporary employees from other staffing agencies will finish out their assignments.

E.     CLIENT and L&L Temporaries, Inc. agree not to directly or indirectly employ or engage as an independent contractor any staff employee of the other party during the term of this Agreement and for a period of 180 days thereafter without the prior written consent of the other party. Any party violating this paragraph shall pay to the other party a fee in the amount of 25% of the employee's annualized compensation.

## 3.    INDEPENDENT CONTRACTOR

The services which L&L Temporaries, Inc. shall render under this Agreement shall be as an independent contractor with respect to CLIENT. Nothing contained in this Agreement shall be construed to create the relationship of principal and agent, or employer and employee, between L&L Temporaries, Inc. and CLIENT.

## 4.    COOPERATION

The parties agree to cooperate fully and to provide assistance to the other party in the investigation and resolution of any complaints, claims actions, or proceedings which may be brought by or involve any of the Assigned Employees.

## 5.    TERMS AND TERMINATION

A.     This Agreement shall be for an initial term of twelve (12) months from the effective date of this Agreement.

B.     This Agreement may be terminated, by either party upon thirty (30) days written notice to the other party. Such notice shall be sent recognized overnight courier or by certified mail, return receipt requested, and shall be effective when received. The Agreement may be terminated within the twelve (12) month term.

As to L&L Temporaries, Inc.: As to CLIENT:

Susan Yerdon, President
L&L Temporaries, Inc.               Iron Mountain Information Management, Inc.

101 Tremont Street                    96 High Street
Boston, MA                             North Billerica, MA 01862
                                       ATT'N  General Manager

3

C.  If this Agreement is terminated by either party and CLIENT desires to have all or some of the Assigned Employees continue to work at CLIENT's facilities, CLIENT shall pay L&L Temporaries, Inc. for such Assigned Employee's services at L&L Temporaries, Inc.'s billing rate in effect at the time of the termination of the Agreement for any services performed by such Assigned Employee for a one-year period following the termination of this Agreement. The 480 hour period for transitioning the employee to the CLIENT's payroll still applies.

D.  The terms of the CLIENT's Purchase Order Agreement and its addendums 2, 3 and 6 not addressed specifically in this Agreement apply.

## 9.   MISCELLANEOUS

A.  No provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing and signed by the parties.

B.  This Agreement contains the entire understanding between the parties hereto, and supercedes all prior agreements and understandings relating to the subject matter hereof.

C.  This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

## 10.   REMEDIES

Any controversy or dispute between the parties shall be resolved in binding arbitration before the American Arbitration Association with the costs thereof to be shared by the parties.

## 10.   VOLUME DISCOUNT

Volume discount to be given on a graduated scale based upon weekly hours billed. Any discount given will be computed weekly and noted on the weekly invoice. Scale as follows: 999 hours or less 5%, 1000-1999 10%, and 2000 or above 15%.

4

IN WITNESS WHEREOF, this Agreement has been duly executed by L&L Temporaries, Inc. and CLIENT on the dates set forth below.

CLIENT

_____
Signature

STeven Kiscia
Printed Name

Gm
Title

4/20/04
Date

L&L Temporaries, Inc.

_____
Signature

Susan Yerdca
Printed Name

Tresident
Title

4/20/2004
Date

5

## IRON MOUNTAIN                          _L & L Temporaries, Inc_

| | |
|---|---|
| **Records Clerk** | $15.02 |
| **Data Entry** | $15.02 |
| **Third Shift/Differential** | $15.77 |
| **Transportation Helpers** | $15.02 |
| **Customer Service Representative** | $15.02 |
| **Administrative Assistant** | $16.54 |
| **Accounting Clerk** | $16.54 |
| **Driver Trainee** | $17.98 |

.****Professional or Management positions, not covered in the scope above will be quoted at the time of placement. Bill rates will be in accordance with the agreed upon margin.****

◥JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS
IRON MOUNTAIN INFORMATION MANAGEMENT, INC.

**DEFENDANTS**
L&L TEMPORARIES, INC. and FLEXIBLE FUNDING, LLC

**(b)**  County of Residence of First Listed Plaintiff    Montgomery County, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)
Larry L. Varn, Sullivan & Worcester LLP, One Post Office Square, Boston, MA 02109

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
       Plaintiff

☐ 3  Federal Question
       (U.S. Government Not a Party)

☐ 2  U.S. Government
       Defendant

☒ 4  Diversity
       (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                     and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1 Original
     Proceeding

☐ 2 Removed from
     State Court

☐ 3 Remanded from
     Appellate Court

☐ 4 Reinstated or
     Reopened

☐ 5 Transferred from
     another district
     (specify)

☐ 6 Multidistrict
     Litigation

☐ 7 Appeal to District
     Judge from
     Magistrate
     Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1335
Brief description of cause:
Plaintiff seeks declaratory judgment against plaintiff in contract dispute.

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
      UNDER F.R.C.P. 23

DEMAND $
+ 75,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):    JUDGE                              DOCKET NUMBER

DATE
05/11/2005

SIGNATURE OF ATTORNEY OF RECORD
_Samuel A. Miller_

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____