# EXHIBIT A

Case 1:05-cv-10979-DPW    Document 5    Filed 06/09/2005    Page 1 of 19

03/10/2005   13:39                                                                         NO.189   P02



### IRON MOUNTAIN
The Leader in Records & Information Management

TEMPORARY SERVICES AGREEMENT

This Agreement dated this 20th day of April, 2004, by and between Iron Mountain Information Management, Inc., its affiliates and subsidiaries (hereinafter referred to as " IRON MOUNTAIN" ), and L & L Temporaries, Inc (corporation, individual proprietorship, partnership) (hereinafter referred to as " AGENCY" ), with offices at 101 Tremont Street, Boston, MA (Federal Tax ID or social security #) 02-0581393.

1. **Retention of AGENCY**
   IRON MOUNTAIN hereby engages AGENCY to provide temporary personnel to IRON MOUNTAIN pursuant to the terms and conditions set forth herein.

2. **General Terms and Conditions**
   AGENCY shall provide to IRON MOUNTAIN the services of its employees as requested by IRON MOUNTAIN. AGENCY shall manage the provision of services to IRON MOUNTAIN in accordance with the provisions of this Agreement.

3. **AGENCY Responsibilities**
   AGENCY will coordinate with IRON MOUNTAIN for interview and assignment arrangements including date, time, location, agenda, duration, job content.

   AGENCY will have all potential temporary personnel for IRON MOUNTAIN complete the pre-screening and authorization form. AGENCY will need to review form, sign off and submit to hiring contact prior to assignment of temporary personnel.

   AGENCY shall be required to conduct a seven (7) year retrospective criminal background investigation on any employee it assigns to any IRON MOUNTAIN facility. AGENCY employees may begin an assignment once all IRON MOUNTAIN' S Temporary Services Agreement has been signed and the prescreening forms completed. However, the background investigation process must have been initiated by the AGENCY prior to assignment. AGENCY employees whose background checks have not been received within seven (7) calendar days must be removed from assignment until such time as the background check has been received and reviewed as described below.

   Any AGENCY employee whose background check discloses <u>any</u> criminal record will be removed from assignment until IRON MOUNTAIN' S Security Department and/or Human Resources Department review the results and the matter is adjudicated.

   To accommodate multiple assignments of the same personnel, the results of background investigations conducted under this section will be valid for one (1) year from the initial date of assignment.

   Contract and/or temporary employees assigned to Iron Mountain shall be required to undergo a substance abuse examination before he/she is assigned to any Iron Mountain

facility. A minimum 5-panel substance abuse urinalysis examination is to be administered through a SAMSHA certified laboratory and MRO.

Temporary agencies will certify to Iron Mountain, in writing, that an examination was administered and negative results were received.

AGENCY will have gained the candidate's employment references and will provide them to IRON MOUNTAIN upon request. IRON MOUNTAIN reserves the right to verify all references provided by AGENCY.

Upon selection of AGENCY's candidate for the assignment, Company and AGENCY will sign the Conditions of Assignment verifying the candidate's name, type of assignment, hourly rate, start date and projected end date. IRON MOUNTAIN may terminate use of said candidate at any time without notice.

4. <u>Payment and Invoicing</u>
AGENCY shall maintain complete and accurate accounting records in a form in accordance with standard accounting practices, and shall retain such records (and make available to IRON MOUNTAIN for review) for one (1) year from the final date of payment

AGENCY may invoice monthly for services provided. Invoices must be accompanied by a signed time slip, and are payable thirty days after receipt.

All invoices shall reference the contractor's name, the supervising manager's name and period being invoiced. Invoices should be directed to:

> L & L Temporaries, Inc
> P.O. Box 1300
> Suisun City, CA 94585-4300
> syerdon@lnlassociates.com
> 617-423-4955

5. <u>Performance Guarantee – AGENCY Personnel</u>
AGENCY agrees that should each employee placed with IRON MOUNTAIN on a contractual basis may be without financial obligation within sixteen (16) hours of commencing assignment should said AGENCY employee be found to be unqualified for said assignment.

In the event that IRON MOUNTAIN, at any time, determines that the work performed or any portion thereof is unsatisfactory, it may, immediately require the AGENCY to correct or improve its performance by notifying AGENCY in writing specifying the nature of the deficient performance. AGENCY shall take immediate steps to rectify the situation. Should the AGENCY fail to perform to the satisfaction of IRON MOUNTAIN within 10 days, IRON MOUNTAIN has the right to terminate this agreement. Upon such termination, IRON MOUNTAIN is liable only for the work performed, less any costs associated with rectifying the AGENCY's performance.

6. AGENCY Personnel - Employment
AGENCY agrees that any individuals performing Services hereunder shall at all times be employees or independent contractors of AGENCY and that such individuals shall not be deemed to be employees of IRON MOUNTAIN. AGENCY shall be exclusively responsible for the payment of any and all employment and other tax obligations (including employee benefits) arising out of payments to individuals assigned to provide Services hereunder.

AGENCY represents that its staff is comprised of experienced professionals qualified to perform the Services in accordance with the highest professional standards.

7. Temporary to Permanent Conversion
If AGENCY's employee is hired directly or indirectly by IRON MOUNTAIN or any of its divisions and/or affiliates, there will be no temporary-to-permanent conversion fee if the employee has worked at IRON MOUNTAIN for a period of at least twenty (20) consecutive weeks. If AGENCY's employee is hired directly or indirectly by IRON MOUNTAIN or any of its divisions and/or affiliates prior to completion of a twenty (20) consecutive week period, a temporary-to-permanent conversion fee will be paid as follows: Starting at 20% of the annual hiring base salary, the percentage will be reduced by 2% for every two weeks worked under the contract assignment.

Said conversion of AGENCY's employee to full-time employment with IRON MOUNTAIN is contingent upon the successful completion of the standard hiring process by AGENCY's employee. This includes but is not limited to application process, reference verification, drug screening and background investigation. Should AGENCY's employee fail the drug screening process, said employee's contractual employment with IRON MOUNTAIN shall be terminated immediately.

8. Term of Agreement
This Agreement shall commence when signed by both parties and continue until AGENCY has completed performance of the Services. Notwithstanding the foregoing, IRON MOUNTAIN shall have the right to terminate this Agreement for convenience at any time upon notice to AGENCY. In the event of termination for convenience, IRON MOUNTAIN will pay AGENCY for all Services performed to the effective date of termination.

9. Warranty and Indemnification
AGENCY represents and warrants that it has the full right to enter into and perform its obligation under this Agreement.

AGENCY warrants that employees are qualified, and if required, licensed and tarriffed, as for couriers, if necessary under applicable laws to perform services required in the proposed states of operation.

10. No Infringement
AGENCY represents and warrants to IRON MOUNTAIN that any software, technology, tools, know-how or other intellectual property provided or used by AGENCY or its personnel for purposes of performing services pursuant to this Agreement will not violate any patents, trade secrets or copyright rights or other confidentiality rights of third

3

parties. AGENCY shall indemnify IRON MOUNTAIN and defend IRON MOUNTAIN from any loss, claim, damage or cost arising from a breach of the foregoing warranty.

11. Insurance; Indemnification

AGENCY shall be solely responsible for all physical injuries (including death) to persons (including but not limited to employees of IRON MOUNTAIN) or damage to property but not limited to property of IRON MOUNTAIN or AGENCY or its contractors) resulting from the negligent acts of AGENCY or its contractors, and shall indemnify and hold IRON MOUNTAIN harmless from loss and liability upon any and all claims on account of such injuries or damage; provided, however, that AGENCY and IRON MOUNTAIN, as the case may be, shall be responsible for workers' compensation claims brought by their respective employees, without regard to negligence of either. AGENCY's contractors shall each carry their own workers' compensation insurance. AGENCY's and each of its contractor's compensation carriers shall waive any right of subrogation in favor of IRON MOUNTAIN.

AGENCY shall procure and maintain the types of insurance listed below and in the minimum limits shown. Such insurance shall be provided by an insurer authorized to do business in the jurisdiction where services will be performed and that maintains an A.M. Best's rating of B-plus X or better. AGENCY will provide a certificate of such insurance, which will identify IRON MOUNTAIN as an additional insured on the liability policies.

| Coverage | Limits |
|---|---|
| Workers Compensation | Statutory |
| Employers' Liability | $2.0 million per accident or bodily injury by accident. $2.0 million aggregate for disease. and $2.0 million per employee for bodily injury by disease. |
| General Liability, including contractual | $2.0 million per occurrence combined single limit, $2.0 million aggregate |
| Automobile Liability | $2.0 million per accident, combined single limit |

12. OSHA Requirements

Acknowledging that injuries sustained by AGENCY employees at Iron Mountain sites may require their recording on the site's OSHA log, in the event of a totally or partially disabling injury or AGENCY employee's removal from the Iron Mountain site for continued work, AGENCY agrees to provide Iron Mountain site with sufficient information to fulfill it's OSHA recordkeeping responsibilities. The information required includes but is not necessarily limited to information necessary to complete the 301 associated with the injury and ongoing data to update any ongoing restricted duty or lost time from work. AGENCY agrees to continue to provide this information until maximum reporting criteria are met.

13. **Solicitation and Employment**
   During the term hereof, and continuing for a period of six (6) months following the cancellation or termination of this Agreement, IRON MOUNTAIN will not solicit (or employment, attempt to hire or hire the employees or independent contractors of AGENCY; provided, that this provision shall not prohibit IRON MOUNTAIN hiring such persons if they respond to " help wanted" advertisements in newspapers or similar non-directed media, or the position has been initiated as a temporary to permanent conversion.

   Said expectation is true in the reverse: AGENCY will not solicit IRON MOUNTAIN employees during the term of this agreement and continuing for a period of six (6) months following cancellation or termination, provided, that this provision shall not prohibit AGENCY hiring such persons if they respond to " help wanted" advertisements in newspapers or similar non-directed media or the position has been initiated as a temporary to permanent conversion.

14. **Confidential Information**
   All original materials, information and technology developed for IRON MOUNTAIN pursuant to this Agreement will belong exclusively to IRON MOUNTAIN and will be deemed to have been developed and created by AGENCY for IRON MOUNTAIN as work for hire. IRON MOUNTAIN shall have all rights to use, exploit and license any products of work performed by AGENCY pursuant to this Agreement, including rights to patent or register any intellectual property produced by AGENCY hereunder.

   Addendum 1 dictating the terms and conditions applicable to the protection of personal data is hereby incorporated into this agreement.

15. **Assignment**
   This Agreement may not be assigned by either party without the prior written permission of the other.

16. **Applicable Law**
   This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts without giving effect to principles of conflicts of laws.

17. **Notices**
   All notices, demands and other communications required or permitted hereunder or in connection herewith shall be in writing and shall be deemed to have been duly given if delivered (including by receipt verified facsimile transmission) or mailed in the Continental United States by first class mail, postage prepaid, to a party at the following address, or to such other address as such party may hereafter specify by notice:

<u>If to AGENCY:</u>

101 Tremont Street
Suite 515
Boston, MA 02108
Attn: Susan Yerdon
Telefax: (617) 423-4955

If to Client:

IRON MOUNTAIN INFORMATION MANAGEMENT, Inc.
745 Atlantic Avenue
Boston, MA 02111
Attn: Garry Watzke, Vice President & General Counsel
Telefax: 617-368-9117

18. **Section Headings**
The headings and titles of sections, paragraphs and the like are inserted for convenience of reference only and shall no affect the meaning or interpretation of this Agreement in any manner.

19. **Entire Agreement**
This Agreement and the documents incorporated by reference in this Agreement sets forth the entire understanding between the parties hereto regarding the subject matter hereof and may not be amended except by an instrument in writing signed by both parties.

20. **No Waiver**
Neither the failure nor delay by either party to exercise any right, remedy, power or privilege under this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver with respect to any occurrence be construed as a waiver with respect to any other occurrence. No waiver of any right, remedy, power or privilege under this Agreement will be effective unless in writing signed by the party to be charged thereby.

21. **Counterparts**
This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute one and the same Agreement.

IRON MOUNTAIN:                                AGENCY:

IRON MOUNTAIN
INFORMATION MANAGEMENT, INC.                  L & L Temporaries, Inc

By: _____                         By: _____
Name: Steven _____                            Name: Susan Yerdon
Title: _____                           Title: President

6

# ADDENDUM 1

Additional Terms and Conditions Applicable to the Protection of Personal Data ("Addendum")

The following additional terms and conditions (*Addendum*) are expressly incorporated into the Base Agreement (as hereinafter defined) or into the terms and conditions of any procurement agreement entered into between Iron Mountain and the Provider whose name appears at the signature line.

1. **DEFINITIONS.** The following terms shall have the respective meanings assigned below when used as capitalized terms in this Addendum.

*Base Agreement* means any agreement between Provider and Iron Mountain pursuant to which Provider renders Provider Services to Iron Mountain, including invoices, purchase orders or other like documents.

*Customer* means Iron Mountain's customers and the affiliates of any such customers.

*Data Subject* means a natural person who can be identified by or is the subject of Personal Data, including without limitation, employees, clients, contractors, or other associates of Iron Mountain or of a Customer of Iron Mountain, or the dependents of such person.

*Parties* means collectively, Provider and Iron Mountain, together with their respective successors and permitted assigns, and *Party* means each of them, as the context may require.

*Personal Data* means information that is identifiable to specific individuals, or by which specific individuals can be identified, whether or not publicly available, such as name, identification number, address, one or more factors related to physical, physiological, mental, economic, racial, cultural or social identity, habits, union membership or any other personal characteristics or attributes, obtained or accessed by Provider through its relationship with Iron Mountain.

*Process(ing)* means any operation or set of operations performed upon Personal Data, whether or not by automatic means, such as collection, recording, organization, storage, adaptation or alteration, retrieval, consultation, use, disclosure by transmission, dissemination or otherwise making available, alignment or combination, blocking, erasure or destruction.

*Provider Services* shall be those services being rendered by Provider under the Base Agreement.

2. **PROVIDER RESPONSIBILITIES.** Provider shall:

    (a) not use any Personal Data to solicit Data Subjects or otherwise Process the Personal Data for any purpose other than the provision of the Provider Services;

    (b) not disclose or transfer any Personal Data to any third party except (i) with the express prior written consent from Iron Mountain, and in the case of any such permitted transfer, Provider shall ensure that the third party enters into a written agreement acceptable to Iron Mountain obligating that third party to comply with the standards and requirements set forth in this Addendum or (ii) pursuant to law;

    (c) not record, copy or retain any Personal Data except to the extent and for the duration required to provide the Provider Services and as otherwise required by applicable law;

    (d) upon reasonable request and without material disruption of Provider's business, permit Iron Mountain or its authorized representatives, upon providing not less than twenty-four hours' advance notice, to examine any Personal Data in Provider's possession or custody. If a Data Subject wishes to examine any Personal Data in Provider's possession, Provider shall retrieve the

7

Personal Data and promptly return it to Iron Mountain so that Iron Mountain may, in turn, meet its obligations with respect to the examination of any such Personal Data;

(e) upon request by Iron Mountain, return specified Personal Data to Iron Mountain, or at the direction of Iron Mountain, correct, delete, update or otherwise modify the Personal Data;

(f) maintain and Process the Personal Data in accordance with applicable laws and any industry or other codes of practice, provided that all such applicable laws and industry standards meet or exceed the standards and safeguards required under this Addendum;

(g) ensure the compliance by its employees and representatives involved in maintenance or Processing of Personal Data provided under the terms of this Addendum;

(h) keep Personal Data confidential and maintain adequate technical and organizational measures consistent with professional industry standards for the protection of Personal Data, to:

   1. respect and maintain the confidentiality and security of Personal Data and prevent unauthorized persons from gaining access to Personal Data;

   2. prevent storage cartons, files or other media containing Personal Data from being read, copied, modified or removed by unauthorized persons;

   3. ensure that Personal Data cannot be read, copied, changed or deleted by unauthorized parties during data transfer or data carrier transport (transport control);

   4. prevent accidental or unlawful destruction or accidental loss, alteration, disclosure or access to Personal Data; and

   5. continue to review its security programs and procedures to ensure that they are consistent with professional industry standards, provided that all such security programs and industry standards meet or exceed the standards set forth in this Addendum.

(i) ensure that all Personal Data shall remain in the jurisdiction(s) set forth in <u>Attachment 1</u> to this Addendum.

(j) to mitigate, to the extent practicable, any harmful effect that is known to Provider of a use or disclosure of Personal Data by Provider in violation of the requirements of this Addendum;

(k) to immediately report to Iron Mountain any use or disclosure of Personal Data not provided for in this Addendum and to document any such disclosures as the same may be required for purposes of providing any Data Subject with an accounting of disclosure of Personal Data; and

(l) not to Process any Personal Data in the possession of Provider unless expressly directed in writing by Iron Mountain to do so.

3. **GENERAL REQUIREMENTS.** Provider understands and agrees that this Addendum does not convey to Provider any ownership or other interest in and to the Personal Data. Without limiting any other similar requirements that may be applicable, Provider shall comply with all reasonable policies and requirements (including, without limitation, execution of agreements) reasonably requested by Iron Mountain from time to time to protect Personal Data, including policies and requirements imposed in response to Iron Mountain's Customer requirements and/or applicable laws and regulations, as the same may be amended from time to time. However, if Provider is not able to comply with any such requirements without material expense or material risk, and Iron Mountain

8

nevertheless insists upon compliance, then Iron Mountain may terminate the Base Agreement (if any) pursuant to which Provider receives the Personal Data along with this Addendum.

4. **PROVIDER'S INTERNAL REQUIREMENTS.** Provider's policies and procedures regarding data privacy and security as of the date hereof are attached as Attachment 2 to this Agreement. In addition to, and without limitation of, the foregoing provisions of this Addendum, Provider will adhere to the policies and procedures set forth in Attachment 2 in connection with Provider's handling of Personal Data pursuant to the terms of this Addendum or the Base Agreement (if any). To the extent the Base Agreement contains provisions relating to the security, disclosure or other Processing activities (other than the specific details describing the Provider Services) that conflict with the terms of this Addendum, the terms of this Addendum shall supersede to the extent of such conflict. If Provider enhances its general policies and procedures regarding data privacy and security at any time during the term of this Addendum in a manner that could improve protection for Iron Mountain, its Customers and Data Subjects, such enhanced policies and procedures will become a part of Attachment 2 (subject to Iron Mountain's prior written consent), such that at all times Provider's obligations under this Addendum are consistent with the highest standards and levels of protection offered by Provider to any party.

5. **AUDIT OF RECORDS.** Provider agrees to make its internal practices, books and records relating to the use and disclosure of Personal Data received from, or created or received by Provider on behalf of Iron Mountain or one of its Customers, available to Iron Mountain, or at the request of Iron Mountain, by any governmental agency having jurisdiction with respect to the Personal Data.

6. **INDEMNIFICATION.** In addition to and not in lieu of any indemnification obligations set forth in the Base Agreement, Provider agrees to indemnify, defend and hold harmless Iron Mountain, its subsidiaries, affiliates, shareholders, directors, officers, employees and agents, from any claim, demand, liability, expense, or loss, including reasonable attorneys' fees, made by any third party due to or arising out of, or in any way connected with Provider's Processing of or access to the Personal Data, Provider's violation of this Addendum, or Provider's failure to adhere to any law applicable to the Processing and security of the Personal Data.

7. **GENERAL.**

    (a) <u>Term.</u> This Addendum shall continue for the duration of any Base Agreement, provided, however, that Iron Mountain may terminate this Addendum without cause at any time upon sixty (60) days' prior written notice to Provider.

    (b) <u>Termination for Cause.</u> Upon a material breach by Provider, Iron Mountain shall provide an opportunity for Provider to cure the breach and terminate the Addendum (together with the Base Agreement) if Provider does not cure the breach within the time specified by Iron Mountain, or immediately terminate this Addendum (and the related Base Agreement) if Provider has breached a material term of this Addendum and cure is not possible.

    (c) <u>Effect of Termination.</u> Upon termination of this Addendum for any reason, Provider shall return, or, at the written request of Iron Mountain, destroy or de-identify all Personal Data received by Provider from Iron Mountain, or created or received by Provider on behalf of Iron Mountain or its Customers, and Provider shall cause its own third party service providers to do the same in respect of the Personal Data. Provider shall retain no copies of Personal Data. In the event that Provider is directed by Iron Mountain to destroy or de-identify Personal Data in lieu of returning it to Iron Mountain, then Provider shall provide a Certificate of Destruction to Iron Mountain, in form and substance reasonably acceptable to Iron Mountain. The provisions of Sections 1, 5, 6 and 7 shall survive the termination or expiration of this Addendum.

    (d) <u>Assignment.</u> In addition to any requirements or limitations affecting assignment under a Base Agreement, Provider will not assign any Base Agreement unless the assignee agrees to this Addendum with respect to Personal Data transferred to the assignee pursuant to the assigned Base

9

Agreement. The foregoing notwithstanding, this Addendum shall bind and inure to the benefit of the Parties to this Addendum and their respective successors, executors, heirs, representatives, administrators and permitted assigns.

(e) <u>Notices.</u> Any notice required or permitted under this Agreement shall be in writing and shall be effective on delivery or five (5) days after mailing if given by certified or registered mail, return receipt requested, postage prepaid, and addressed to the respective Party at the addresses set forth beneath its signature at the end of this Addendum, or such other address as the Party may designate to the other Party by notice complying with this provision.

(f) <u>Governing Law.</u> This Addendum shall be governed by and construed in accordance with the laws set forth in the Base Agreement, and in the event there is no governing law provision contained in the Base Agreement, then the Laws of the Commonwealth of Massachusetts shall govern without regard to its rules concerning conflicts of laws. Subject to the foregoing, the Parties hereby irrevocably submit to the non-exclusive jurisdiction of any Massachusetts state or federal court sitting in the City of Boston, Massachusetts. In the event of any conflict between foreign laws, rules and regulations and those of the United States, the laws, rules and regulations of the United States shall govern.

(g) <u>Disputes.</u> Subject to the dispute resolution process contained in the Base Agreement (if any), in the event of any dispute concerning this Addendum, the Parties shall each designate an executive, who shall meet and confer, in confidence, to attempt in good faith to resolve all outstanding differences between the Parties. These discussions shall be treated as confidential settlement discussions. If negotiated resolution has not been reached within fourteen (14) days of commencement of such conversations, then either Party may submit the dispute to binding arbitration in Boston, Massachusetts, under the Commercial Arbitration Procedures of the American Arbitration Association, before a sole arbitrator appointed by mutual agreement of the parties, or if agreement cannot be reached, then by the American Arbitration Association. The arbitrator's decision shall be final, and may be confirmed by the judgment of a court of competent jurisdiction. The arbitrator shall have no power or authority to award exemplary or punitive damages, or non-monetary or equitable relief of any sort. During the pendency of any arbitral or court proceeding, each Party shall bear its own attorneys' fees and costs, and the Parties shall each pay half the arbitration costs. The prevailing party in any arbitration or court proceeding under this Addendum will be entitled to recover its fees and costs incurred in the arbitration or proceeding (including attorneys' and arbitration fees and costs) from the non-prevailing Party.

(h) <u>Equitable Relief.</u> Provider acknowledges that monetary damages may be an inadequate remedy for breach by Provider of this Addendum and, accordingly, Iron Mountain may enforce this Addendum, without following the alternative dispute resolution procedures set forth herein, by seeking appropriate equitable relief.

**Iron Mountain Information Management, Inc.**
*Iron Mountain*

By: [signature]

Name: STeve PiScia

Title: General Manager

Address for Notices:
26 High Street
N. Billerica, MA 01862

**L & L Temporaries, Inc**
*Provider/Name of Agency*

By: [signature]

Name: Susan Yergon

Title: President

Address for Notices:
101 Tremont Street
Suite 515
Boston, MA 02108

**Attachment 1**

### LOCATION OF PERSONAL DATA WHILE IN PROVIDER'S POSSESSION:

Location/Address of Physical Personal Data:

Note: No employees of Provider are permitted to remove Personal Data from Iron Mountain's facilities.

Location of Personal Data in Electronic Format (generally the location of the server on which such electronic format of Personal Data resides):

Note: No employees of Provider are permitted to remove Personal Data in electronic form from Iron Mountain's facilities through any means whatsoever.

11

**Attachment 2**

## PROVIDER POLICIES AND PROCEDURES
## REGARDING DATA PRIVACY AND SECURITY

Please attach here a copy of the confidentiality agreement that your temporary employees are required to sign pursuant to which they agree to maintain the confidentiality of any information received by them from your clients during the course of performance of services.

Please also indicate here the manner in which you conduct reference checks for your temporary personnel and whether such persons undergo a background investigation or drug screening test.

In addition, please attach a copy of your policy regarding the treatment of confidential information and personal data that you provide to all temporary personnel.

# AGREEMENT

IT IS HEREBY AGREED by and between L&L Temporaries, Inc., and its successors and assigns, and Iron Mountain Information Management, Inc. (Boston District Only), ("CLIENT"),

WHEREAS, L&L Temporaries, Inc. is engaging in the business of assigning its employees to perform services for clients, and providing related management and human resources services; and

WHEREAS, CLIENT desires to engage L&L Temporaries, Inc. to provide such services;

NOW THEREFORE, in consideration of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1. **DUTIES OF L&L TEMPORARIES, INC.**

    A. L&L Temporaries, Inc. shall provide to CLIENT the services of its employees ("Assigned Employees") as requested by CLIENT and shall manage them in accordance with the provisions of this Agreement.

    B. L&L Temporaries, Inc. agrees to assume full responsibility for paying, withholding, and transmitting payroll taxes; making unemployment contributions' and handling unemployment and workers' compensation claims involving Assigned Employees with respect to compensation that L&L Temporaries, Inc. has agreed to pay.

    C. L&L Temporaries, Inc. shall recruit, interview, test, screen, and ensure compliance with legally required pre-employment obligations, such as criminal conviction record, social security number verification, education, and drug testing, for all Assigned Employees prior to their assignment at CLIENT.

    D. L&L Temporaries, Inc. shall pay all costs associated with advertising for temporary employment positions covered by this Agreement.

    E. L&L Temporaries, Inc. will provide CLIENT with custom reporting on a monthly basis, as requested. Reports will include but are not limited to break outs of spend by facility (weekly, monthly, and YTD) and temporary employees on staff by hire date.

    F. L&L Temporaries, Inc. agrees to indemnification terms and other applicable terms as stated in the CLIENT's Purchase Order Agreement and its addendums.

1

G.  If a temporary employee does not fill the requirements of a project because of lack of appropriate skills to complete the project or chooses not to return before the project end date, L&L Temporaries, Inc. agrees to compensate the client with 8 16 hours ~~eight~~ of training time ~~(four~~ for each employee) for the replacement employee, at no charge.

2. **DUTIES OF CLIENT**

   A.  CLIENT will pay for services provided by L&L Temporaries in accordance with this Agreement on a weekly basis. Payment shall be due thirty (30) days from receipt of the invoice.

   B.  CLIENT agrees to pay for Assigned Employees at L&L Temporaries, Inc.'s unified rates (see attached) by job category in effect as of the date of the placement of the Assigned Employee with CLIENT. In the event a portion of any invoice is disputed, the undisputed portion shall be paid.

   C.  CLIENT may hire or engage as independent contractor any Assigned Employee at any time after such Assigned Employee has worked at CLIENT's facility for at least 480 hours in any one calendar year (with no break in service of more than ten (10) business days) without owing L&L Temporaries, Inc. a placement fee. In the event that CLIENT hires or engages as an independent contractor any Assigned Employee prior to such 480 hour period, CLIENT shall pay to L&L Temporaries, Inc. an amount equal to what CLIENT would have paid L&L Temporaries, Inc. had such Assigned Employee worked at CLIENT through L&L Temporaries, Inc. for 480 hours at L&L Temporaries, Inc.'s then current rates.

   D.  CLIENT agrees not to place any employee from any employment agency (other than L&L Temporaries, Inc.) at its facility(s) located at 175 Bearfoot Road, Northboro, MA, 32 George Street, Boston, MA, 21 Fellows Street, Boston, MA, 134 Hampden Street, Boston, MA, 28 Fitchburg Street, Somerville, MA, 1 Old Forge Hill Road, Franklin, MA, 1515 Washington Street, Braintree, MA, 17 Hydro Plant Road, Milton, NH, 26A Pleasant Street, Scarborough, ME, 148 Cook Street, Billerica, MA, 96 High Street, Billerica, MA, 216 Canal Street, Lawrence, MA during the term of this Agreement, unless L & L Temporaries, Inc. is not able to supply suitable Assigned Employee as requested. CLIENT will provide as much notice as reasonably possible for temporary labor needs. In most cases, L&L Temporaries, Inc. will have 24 hours to fulfill the request for temporary labor. However, if business needs of the CLIENT do not allow 24 hours, the CLIENT reserves the right to use other employment agencies to staff the project if L&L cannot provide adequate staffing within the timeframe. Quality requirements must also be met by L&L Associates, Inc. Record Center temporary

2

employees must maintain the productivity standard dictated by the project scope and data entry temporary employees must meet the minimum 8000 key strokes per hour with 98% accuracy standard. Other productivity and quality requirements will be communicated with requests for temporary employees. Current temporary employees from other staffing agencies will finish out their assignments.

E. CLIENT and L&L Temporaries, Inc. agree not to directly or indirectly employ or engage as an independent contractor any staff employee of the other party during the term of this Agreement and for a period of 180 days thereafter without the prior written consent of the other party. Any party violating this paragraph shall pay to the other party a fee in the amount of 25% of the employee's annualized compensation.

3. **INDEPENDENT CONTRACTOR**

The services which L&L Temporaries, Inc. shall render under this Agreement shall be as an independent contractor with respect to CLIENT. Nothing contained in this Agreement shall be construed to create the relationship of principal and agent, or employer and employee, between L&L Temporaries, Inc. and CLIENT.

4. **COOPERATION**

The parties agree to cooperate fully and to provide assistance to the other party in the investigation and resolution of any complaints, claims actions, or proceedings which may be brought by or involve any of the Assigned Employees.

5. **TERMS AND TERMINATION**

A. This Agreement shall be for an initial term of twelve (12) months from the effective date of this Agreement.

B. This Agreement may be terminated, by either party upon thirty (30) days written notice to the other party. Such notice shall be sent recognized overnight courier or by certified mail, return receipt requested, and shall be effective when received. The Agreement may be terminated within the twelve (12) month term.

As to L&L Temporaries, Inc.:   As to CLIENT:

Susan Yerdon, President
L&L Temporaries, Inc.              Iron Mountain Information Management, Inc.
101 Tremont Street                 96 High Street
Boston, MA                         North Billerica, MA 01862

3

C.  If this Agreement is terminated by either party and CLIENT desires to have all or some of the Assigned Employees continue to work at CLIENT's facilities, CLIENT shall pay L&L Temporaries, Inc. for such Assigned Employee's services at L&L Temporaries, Inc.'s billing rate in effect at the time of the termination of the Agreement for any services performed by such Assigned Employee for a one-year period following the termination of this Agreement. The 480 hour period for transitioning the employee to the CLIENT's payroll still applies.

D.  The terms of the CLIENT's Purchase Order Agreement and its addendums 2, 3 and 6 not addressed specifically in this Agreement apply.

9. **MISCELLANEOUS**

A.  No provision of this Agreement may be amended or waived unless such amendment or waiver is agreed to in writing and signed by the parties.

B.  This Agreement contains the entire understanding between the parties hereto, and supercedes all prior agreements and understandings relating to the subject matter hereof.

C.  This Agreement shall be governed by the laws of the Commonwealth of Massachusetts.

10. **REMEDIES**

Any controversy or dispute between the parties shall be resolved in binding arbitration before the American Arbitration Association with the costs thereof to be shared by the parties.

10. **VOLUME DISCOUNT**

Volume discount to be given on a graduated scale based upon weekly hours billed. Any discount given will be computed weekly and noted on the weekly invoice. Scale as follows: 999 hours or less 5%, 1000-1999 10%, and 2000 or above 15%.

4

IN WITNESS WHEREOF, this Agreement has been duly executed by L&L Temporaries, Inc. and CLIENT on the dates set forth below.

| CLIENT | L&L Temporaries, Inc. |
|---|---|
| _[signature]_ | _[signature]_ |
| Signature | Signature |
| Steven Lisera | Susan Yerdca |
| Printed Name | Printed Name |
| GM | President |
| Title | Title |
| 4/20/04 | 4/20/2004 |
| Date | Date |

5

## IRON MOUNTAIN                               *L & L Temporaries, Inc*

| | |
|---|---|
| Records Clerk | $15.02 |
| Data Entry | $15.02 |
| Third Shift/Differential | $15.77 |
| Transportation Helpers | $15.02 |
| Customer Service Representative | $15.02 |
| Administrative Assistant | $16.54 |
| Accounting Clerk | $16.54 |
| Driver Trainee | $17.98 |

****Professional or Management positions, not covered in the scope above will be quoted at the time of placement. Bill rates will be in accordance with the agreed upon margin.****